# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**24-490 consolidated with 24-492**

**STATE OF LOUISIANA**

**VERSUS**

**DONALD BRIGGS, III**
**A/K/A DONALD BRIGGS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 69263
HONORABLE THOMAS J. FREDERICK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.

**CONVICTIONS REVERSED AND SENTENCE VACATED.**

**Aaron M. Meche**
**Assistant District Attorney**
**15th Judicial District, Vermilion Parish**
**100 N. State Street, Ste. 215**
**Abbeville, LA 70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Mary Constance Hanes**
**Louisiana Appellate Project**
**P. O. Box 4015**
**New Orleans, LA 70178-4015**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Donald Briggs, III**

**WILSON, Judge.**

A jury found Defendant, Donald Briggs, III, guilty of second degree murder, in violation of La.R.S. 14:30.1. The trial court sentenced Mr. Briggs to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Mr. Briggs now appeals his conviction. For the following reasons, we reverse the conviction and vacate the sentence.

I.

**ISSUES**

We must decide:

(1) whether there is insufficient evidence to support Donald Briggs' conviction for second degree murder and the State failed to negate every reasonable hypothesis of innocence;

(2) whether the prosecutor denied due process by allowing false testimony; and

(3) whether Defendant was denied a fair trial when the court allowed a relative of the victim to sit on the jury.

II.

**FACTS AND PROCEDURAL HISTORY**

On July 14, 2022, Jazaylon Levy was shot while walking outside of an apartment in the Stone Bridge Apartment complex in Abbeville, Louisiana. He later died from his injuries. On October 31, 2022, Donald Briggs and his brother, Stefan Briggs, were each charged by a single grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1. A two-day jury trial commenced on August 29, 2023, after which both Donald and Stefan were found guilty as charged.

On September 26, 2023, Donald Briggs, through counsel, filed a motion for post-verdict judgment of acquittal and a separate motion for new trial. After hearing

testimony and evidence, the motions were denied by the trial court on March 28, 2024. After waiving sentencing delays, both Donald and Stefan were sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On April 8, 2024, Donald Briggs, through counsel, filed a notice of appeal. His trial counsel filed a separate motion to withdraw and appoint the Louisiana Appellate Project ("LAP"). On April 11, 2024, the trial court granted an appeal, and on April 29, 2024, the trial court granted counsel's motion to withdraw and appoint LAP.

III.

## LAW AND DISCUSSION

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

There is a conflict between the sentencing minutes, Uniform Sentencing Commitment Order, and the transcript of sentencing. Both the minutes of sentencing and the Uniform Sentencing Commitment Order state the trial court ordered Donald's sentence to run concurrently with any other sentence he was presently serving. No such statement is reflected in the transcript. Given our decision to reverse the conviction and vacate the sentence, however, this error patent is moot.

## INSUFFICIENT EVIDENCE

In his first assignment of error, Mr. Briggs contends that the evidence was insufficient to convict him of second degree murder as the State failed to negate every reasonable hypothesis of innocence.

The analysis for sufficiency of the evidence is well settled:

2

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13–497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13–2774 (La.5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859.

Donald Briggs was charged with second degree murder, a felony in violation of La.R.S. 14:30.1.  Specifically, Donald was tried under La.R.S. 14:30.1(A)(1), which is defined as the killing of human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"  Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act."

3

La.R.S. 14:10(1). In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant's identity as the perpetrator.

> When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a reasonable doubt. *State v. Smith*, 430 So.2d at 45; *see also State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of *Jackson v. Virginia* is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall*, 523 So.2d at 1310.

*State v. Bright*, 98-0398, pp. 22–23 (La. 4/11/00), 776 So.2d 1134, 1147.

The State contends that the Briggs brothers committed the murder of Jazaylon Levy by shooting from a moving vehicle, and that their intended target was actually an individual by the name of Gavin Garnica, who was standing outside of the apartment complex with Mr. Levy. Specifically, the State contends that as the driver, Donald gave his brother, Stefan, the opportunity to kill the victim; thus, Donald aided and abetted in the commission of the victim's murder. The State further contends that the brothers' motives and specific intent to kill were demonstrated by testimony regarding animosity between the brothers and affiliates of Gavin Garnica.

To support its case, the State presented several witnesses. Detective Lon Hargrave was the first to testify at trial. Detective Hargrave testified that he resided in and was a courtesy security officer for Stone Bridge Apartments on the night of the murder. While taking out his trash, a little after 9:00 p.m., Detective Hargrave heard ten gunshots. Detective Hargrave dropped his bags of trash, retrieved his duty weapon, and began walking toward the area of the gunshots. Detective Hargrave

4

found the victim lying on the ground in the parking lot. According to Detective Hargrave, the victim was awake but not alert.

Detective Hargrave concluded that the shooting was a drive-by shooting and explained why the vehicle must have been moving at the time:

> A   Yes, sir. It would have had to have been going north to south based on the - - later on, once Jazaylon had passed, I was called back. They said, "Hey, can you help us get in an apartment? We want to look at the rendering of an apartment marked 313 just immediately above where Jazaylon was." That was the apartment he was standing in front of. That apartment - - I don't remember the lease holder's name. She wasn't home at the time. That apartment immediately took gunfire obviously, multiple rounds in the residence.
>
> I was able to - - if you understand trajectory - - the line where the bullet goes - - I was able to determine some rounds came from north to south; some came straight on. Some came south to north.
>
> Q   That would indicate a moving vehicle?
>
> A   It would. It also, to me, indicated, based on my training and experience, that the rounds that came south to north were higher, which if you know a rifle, the rifle is going to climb as you shoot. So that tells me that the shots that were south to north came after the ones that came - - I'm sorry. The shots that came north to south came after the ones that came south to north.
>
> Q   Assume that the entry wound in Jazaylon's body was on his right upper buttocks. That would indicate to you this was one of the earlier shots?
>
> A   I actually think, because of the position of the vehicle, it was going to be a shot more in the middle of the thihgh [sic]. I believe the first thing that got shot was either the building or the red vehicle.

After describing the various bullet holes found near the scene, Detective Hargrave further testified:

> A   Yes, Sir. Based on everything that I saw, my training, my experience, the shootings I've worked with APD, the sheriff's office, everything pointed to a vehicle moving at a moderate pace, decent pace, nothing crazy, south in that lane of Stone Bridge - - that final driveway. The rounds started southern, continued and finalized north before the vehicle was out of that area. Everything points to - - it all coming out of one vehicle moving at a constant speed. The rounds that I remember hearing were back to back. There was no gap. There was no alternating

pitch where it could have been more than one weapon. One weapon. One vehicle. One path.

Q     So if Jazaylon was facing the driveway when the shooting started, the vehicle would have been coming from his left?

A     Yes, sir, which I would assume a normal reaction would be the second that first shot rang, he probably turned around which would have caused that - - you had said the higher up shot. I'm assuming he turned to run from the gunshots and that's when he was hit.

When asked if he saw evidence of gunshot damage in the apartment, Detective Hargrave responded, "Absolutely."

Detective Hargrave's investigation revealed that an individual by the name of Gavin Garnica was with the victim at the time of the shooting. According to the detective, "[t]here was rumor and conjecture" that Mr. Garnica was staying in Unit 322. During an interview after the murder, Mr. Garnica thanked Detective Hargrave for the care he gave the victim after the shooting. Mr. Garnica then stated that he was present during the shooting and received a "grazing gunshot to the leg." According to Detective Hargrave, Mr. Garnica was not cooperative, "[o]utside of saying that he was out there when 'them boys started shooting.'"

The next witness was Detective Trent Guidry, who was employed with the Abbeville Police Department at the time of the shooting. Detective Guidry testified that he knew both Defendants and identified them in court. In connection with his investigation, Detective Guidry viewed video from the following locations: the Abbeville Walmart, Stone Bridge Apartments and the adjacent The Havens apartment complex, the Red Barn building on Rodeo Road, the Abbeville Motel 6, and the Texaco station in Delcambre. According to Detective Guidry, Walmart was approximately half a mile from Stone Bridge Apartments, and it would have taken someone about one minute to travel from Walmart to Stone Bridge.

6

The video footage was compiled into a single DVD which was introduced as State's Exhibit 7. While the video was played for the jury, Detective Guidry and the State had the following colloquy:

Q      Detective Guidry, we're going to show this video to the jury. But I'm going to ask you at certain points in the video what you see in the video, all right?

A      Okay.

Q      Let's begin. Can you tell me what this location is?

A      That is the Wal Mart parking lot.

Q      And you observe a vehicle pulling in?

A      I do.

Q      Can you describe it?

A      It is a light colored sedan, silver sedan - - I'm sorry - - light colored sedan.

Q      Can you describe what you see?

A      Two individuals that exited the light colored sedan, one wearing a white shirt and one wearing a black shirt walking into Wal Mart.

Q      Can you describe what you see in the video?

A      Yes, the same two individuals that exited the sedan, the white shirt and the black shirt.

Q      Can you identify these individuals?

A      Yes, the white shirt - - is Donald Briggs, III and the one wearing the black shirt is Stefan Briggs.

Q      Are these the same two individuals?

A      Yes.

Q      What time are we looking at here?

A      That is 9:15 P.M.

Q      Did you determine whether the Wal Mart time stamp clock was accurate?

7

A    Yes, sir.

Q    Describe what you see here.

A    That is the same two individuals walking back to their vehicle.

Q    Can you describe who gets in the driver's seat?

A    Yes, sir. Donald Briggs, III.

Q    And the passenger seat?

A    Stefan Briggs.

Q    What do you see here?

A    The same - - the vehicle they just entered in now leaving.

Q    And headed towards what street?

A    Broadmoor.

Q    Does Broadmoor connect to Rodeo?

A    Yes, sir.

Q    Where does the vehicle turn?

A    Towards Rodeo Road.

Q    When you see the next event, describe it. What's that location?

A    That's the entrance to Stone Bridge Apartments.

Q    You see a vehicle entering Stone Bridge?

A    Yes, a light colored sedan entering the Stone Bridge.

Q    Did you determine whether the Stone Bridge time stamp clock was accurate?

A    It was not.

Q    Describe what you see.

A    That is an exit driveway for Stone Bridge.

Q    Continue. Stop. What did we just hear?

A    Gunshots.

8

Q       Approximately how many?

A       Ten.

Based on the running time on the Stone Bridge time stamp clock, Detective Guidry determined that nine to eleven minutes elapsed between the time the light colored sedan entered Stone Bridge and the time the gunshots were heard.

When it played the video from The Havens apartments, the State noted an exit driveway from Stone Bridge and asked Detective Guidry what he saw:

A       So that is a light colored sedan passing around a white Ford F-150 as it enters the exit gates towards Rodeo Road.

Q       So this light colored sedan actually passed another vehicle to try to get to the gate?

A       Yes.

Q       Describe what this is.

A       So the light colored sedan that passed up the white truck also passed the first vehicle you saw as it was passing towards the exit. The first vehicle that passed in front of the white truck, it also overtook that vehicle as it exited.

Q       Now, the light colored vehicle, when it got to Rodeo, turned which way?

A       That would be northeast.

Q       Left or right?

A       Left.

Q       Describe this.

A       The first vehicle was traveling from Highway 14. The second vehicle is the light sedan that exited Stone Bridge as it continues down Rodeo.

Q       Is that light colored vehicle going back in the same direction it came from?

A       Yes.

Q       Going back east?

9

A    Correct.

Q    What is this location?

A    That is Motel 6 located near the airport.

Q    And describe what you see.

A    Light colored sedan traveling eastbound on Highway 14.

Q    Was that clip almost immediately after the vehicle exited Stone Bridge, that light colored vehicle?

A    Yes, sir, very soon afterward.

Q    What is this location?

A    That is the Texaco station in Delcambre located at Highway 89 and Highway 14.

Q    What is this vehicle?

A    That's a Toyota Camry.

Q    What is the second vehicle, the light colored vehicle, that just came in?

A    You're asking me to describe the model?

Q    Yes, sir.

A    That is a Mercedes Benz.

Q    Do you recognize the individuals exiting the Mercedes?

A    Yes.

Q    Who is the driver?

A    Donald Briggs, III.

Q    Who is that getting in the driver's seat of the Mercedes?

A    Stefan Briggs.

Q    Which way is the Mercedes going?

A    Towards the East.

Q    And the Toyota?

10

A       The Toyota leaves traveling north on 89.  The Mercedes leaves traveling East on 14.

Through his investigation, Detective Guidry learned that the driver of the Toyota Camry was Nyesha Mouton, who was in a relationship with Donald Briggs. Detective Guidry identified State's Exhibit 8 as a picture of the Mercedes driven by Donald Briggs.

Detective Guidry further testified that there were well-defined groups of people between which there was gun violence in Abbeville.  "Group A" was associated with an individual named Roland Bernard, III, while "Group B" was associated with the Briggs brothers.  Detective Guidry testified that there was animosity between the two groups, resulting in gun violence between them.  The State referred Detective Guidry to an incident in September of 2020 wherein Stefan Briggs was wounded.  He described the incident as follows:

A       Stefan and his brother, Donald, were traveling in a vehicle in the area of Martin Luther King and South Lamar Street.  While they were traveling in the vehicle, a shooting took place.  Stefan was shot in his hand and Donald drove him to the emergency room, dropped him off and went after the shooter.

According to Detective Guidry, Stefan did not cooperate in the investigation of the shooting.  Based on his experience and expertise, he opined that a shooting victim's lack of cooperation usually indicated "[p]otential retaliation."  When asked if he was able to determine who fired the shot, Detective Guidry answered, "No, sir. There was a suspect mentioned as Roland Bernard, III."  Detective Guidry testified that Roland Bernard's father was executed in his driveway in November of 2020. Numerous shots were fired, and two different caliber casings indicated two shooters.

In December of 2020, Detective Guidry received a report of another shooting involving Stefan Briggs:

A       During this incident, Donald and his brother, Stefan, were traveling in a vehicle in the area of Seventh Street - - Seventh or Eighth

11

Street, South Louisiana area. While they were traveling in the vehicle, shots were fired at the vehicle and Stefan was struck in his face with a 7.62 caliber rifle.

Once again, Detective Guidry testified that Stefan did not cooperate in the investigation. Additionally, Detective Guidry testified that Gavin Garnica was affiliated with Roland Bernard, III. Finally, Detective Guidry testified that Stefan Briggs had recently been involved in an altercation at the jail with another person affiliated with Roland Bernard, III.

On cross-examination, Detective Guidry agreed that the police did not determine Roland Bernard to be the one who shot Stefan. Additionally, Detective Guidry agreed that the video showing the Texaco station did not have a time or date stamp.

The following colloquy then took place on redirect:

Q When you originally viewed the Texaco video, was that at the Texaco station?

A Yes, sir.

Q And did it have a time stamp on it?

A Yes, sir.

Q Did you use that along with the other video to establish a time line?

A Yes, sir.

Q And were you able to determine approximately how long between the shooting - - the actual shooting - - the sounds of the shooting and the exiting of the vehicle from the light colored sedan from Stone Bridge to the time it arrived at Texaco?

A Yes, sir.

Q How long was that?

A Approximately ten to eleven minutes.

Q Did you attempt to recreate the route?

12

A       Yes, sir.

Q       At the time, was Texaco your destination?

A       The Delcambre Bridge was my destination.

Q       You just timed it?

A       I did.

Q       And the Texaco station from the bridge is what?

A       Maybe - - I don't know.

Q       Half a mile?

A       Three-quarters - - I mean, a quarter of a mile to a half a mile.

Q       And driving normal highway speeds from the Stone Bridge Apartments to Highway 14 and then to the Delcambre bridge took you how long?

A       Approximately nine minutes and twenty seconds, nine minutes, thirty seconds.  That's considering there's four traffic lights and traffic.

Q       Roughly the same amount of time you calculated the vehicle - - the shooting - - the time the vehicle - - the light colored vehicle left Stone Bridge and the time the Mercedes arrived at Texaco?

A       Yes, sir.

Q       And the light colored vehicle was headed in the direction of the Texaco station?

A       Yes, sir.

The next witness, Nyesha Mouton, testified that she saw Donald Briggs the night of July 14, 2022.  According to Ms. Mouton, Donald originally asked her to meet him at a bargain furniture place but then changed the meeting place to "[t]he Texaco" in Delcambre.  Ms. Mouton testified that she drove a brown Toyota Camry to the Texaco station, where Donald arrived in a silver Mercedes.  Donald's brother, Stefan, was also in the car.  According to Ms. Mouton, Donald got into her car and drove to IHOP in Lafayette.  When asked to describe Donald's mood, Ms. Mouton replied, "He was upset, talking to himself."  Ms. Mouton dropped Donald off at

13

Willowind Apartments, where Donald's cousin lived. Ms. Mouton stated that Donald did not talk in the car.

Dr. Christopher Tape, accepted as an expert in the field of forensic pathology, performed an autopsy on the victim. Looking at a diagram, Dr. Tape identified a single gunshot entry wound to the right buttocks. Dr. Tape further testified about the trajectory of the gunshot:

> A     It goes through the pelvis; you can see that. It exits here, left anterior thigh, just across the pelvis. Slightly irregular 0.8 centimeters, about eight centimeters left of midline. And this is at the same inferior superior level as the entry. Its [sic] going basically straight across. Trajectory back right to left, upward and downward.
>
> But now keep in mind, that this trajectory - - this is not so much moving, but its [sic] essentially going straight across there. Just keep in mind that I'm making my measurements in an anatomic position. So you can see its [sic] roughly halfway up the body - - probably more than halfway up the body, going straight across the hips there.
>
> There's an abrasion here on the right ankle and there's also an abrasion here above the entry wound. There's nothing else, no other injuries. This is not to scale, representative only.

Dr. Tape agreed that his report indicated the victim was seventy-one inches, or "[f]ive, eleven." Based on the victim's height, Dr. Tape opined that the victim was standing upright when the bullet entered his body. According to Dr. Tape, the bullet entry wound was "[s]omewhere around three of four feet at least" or "[a]bout half [the victim's] length" from the ground. Dr. Tape concluded that the victim's cause of death was "blood loss from damage to the artery."

The State then recalled Detective Hargrave, who agreed that the video he watched showed a small light colored sedan first exit the Stone Bridge Apartment complex the night of the shooting, followed by a full-sized pickup truck. When asked if he saw any other vehicles exit the parking lot "besides the one that was already in the driveway when the shots were fired," Detective Hargrave answered,

"Only those." Detective Hargrave was then asked if he measured the window sill height of a Ford F-150, and the detective answered:

A       I was able to get multiple makes and models. The average that I saw from that top of that door frame was about four foot, four inches or four foot, seven inches of various makes, models and years. It all averaged about that.

Q       So anywhere from fifty-two to fifty-seven inches?

A       Around.

The following colloquy then took place:

Q       And you heard Dr. Tape - - maybe you didn't hear him - - but Dr. Tape testified that the trajectory of the bullet that killed Mr. Levy was straight on with no up or down angle. You've seen that before?

A       The autopsy, yeah.

Q       So if a bullet was fired from the lowest point in the F-150 - - let's say fifty-two inches - - at a man who's five feet, eleven, approximately where would it strike him?

A       Middle torso.

Q       Not below the waist?

A       I'm six, two. So at four a [sic] half feet of my body, I mean, that's middle torso all day.

Q       Now, did you also compare the heights on a vehicle similar to the one that was seen at the Texaco station driven by the defendant?

A       Yes, sir.

Q       And that is a Mercedes-Benz C300?

A       C class, yes.

Q       And did you find one?

A       Yes, sir.

Q       The Briggs vehicle is 2009 model. Did you locate a 2009 model?

A       I did, sir.

Q       Where did you find it?

15

A        At Mercedes-Benz of Lafayette on Johnston Street.

Detective Hargrave confirmed that the vehicle he examined was a white 2009 Mercedes-Benz C Class.  Detective Hargrave also identified a photograph showing the front passenger door of the Mercedes-Benz with a tape measure going from the ground to the window sill.  Detective Hargrave noted that the tape measured "right around thirty-seven inches, give or take a few millimeters."  Detective Hargrave's testimony continued:

Q        And you're six, two?

A        Yes, sir.

Q        Did you measure on your own body about where that reflected?

A        It was - -

Q        You can stand up.

A        For me, standing up next to the vehicle, it would have put approximately in this area.

Q        Where your left hand is?

A        Yeah. In between - - depending on shoes and everything, it would have been in that general belt line area.

On re-cross examination, Detective Hargrave testified that when he watched the video, he saw three people leaving Stone Bridge.  Detective Hargrave agreed that there were plenty of other vehicles in the complex prior to and after the shooting. When asked if he measured the window distance of any other vehicles, Detective Hargrave replied:

A        I calculated - - no.  But to elaborate, I calculated the distance of

the vehicles that were moving at the time of the incident, the F-150 and

the Mercedes-Benz.

Q        Three vehicles you saw leaving?

A        Correct.

16

Q    Not all the vehicles inside the complex?

A    Correct.

After confirming that the detective was six feet two inches, defense counsel asked him to show the jury again where the bullet would have hit him. The detective pointed to an area, but the record does not reflect the area to which he was pointing. The following colloquy ensued:

Q    So it's safe to say that at five foot, eleven, three inches shorter, it would probably would have come up towards - - you know, lower back to mid-back, wouldn't you agree?

A    I could only say where I think it would hit me based on the window sill where it would be.

Q    And you have six foot, two frame?

A    Yeah.

Continuing on cross-examination with the other defense counsel, the following colloquy ensued:

Q    You stated that you only measured vehicles that matched more or less the description of the vehicles that you saw in the clip that you received from the state, correct?

A    Uh-huh (affirmative response).

Q    But you were on the scene. And when you came shortly after the shooting, you didn't see any other vehicles leaving, right?

A    Correct.

Q    But you did see other vehicles in the parking lot, correct?

A    Correct, yeah.

Q    And you're not saying that these measurements excludes the possibility of gunshots coming from any other kind of similar vehicle as to what you saw, correct?

A    Unless it came from a parked vehicle that was still on the scene - -

Q    Yes.

17

A - - When I came out, then there would be no other ones.  But the only vehicle that departed between the shooting and me coming on scene I would have seen them leave was those three.

As for the possibility that the shots could have been fired from a vehicle other than the three shown in the video, the testimony continued as follows:

Q So what I'm asking is, you're only measuring the vehicles that you saw leaving?

A Correct.

Q But you're not excluding the possibility that the vehicle which fired the shot could have still be [sic] on scene?

A It's possible, but again, we're also talking about my two vehicles, my personal vehicle and my department vehicle, my neighbors who came outside when the shooting happened.  They weren't in their vehicles.  There are other vehicles in that generic area, but to say - - plus the vehicle that got shot would have been Mr. Gernekus Peeple from 322.

There are multiple vehicles there, but I do not see the ability for any other vehicle that was currently parked there to have been involved in the shooting.

Q But you weren't there; you didn't see it?

A Correct.  At the time of the shooting, no, correct.

The final witness to testify was Kashawna Preston, a person who knew the victim and was at Stone Bridge Apartments the night of the shooting.  Ms. Preston was with several people, including the victim and Gavin Garnica.  Right before the shooting, Ms. Preston and her sister were walked to their cars by the victim, Mr. Garnica, and a teenager by the name of Javian.  Ms. Preston and her sister were in separate cars and left at about the same time.  Ms. Preston testified that she pulled out first, and her sister pulled out right behind her.  Regarding other cars in the parking lot, Ms. Preston testified as follows:

Q When you walked out to get in your car in the parking lot, could you look down there and see if any other cars were parked?

A       Yeah, you walk out and to the left, you see all the cars that was parked.  That's how I noticed the vehicle.

Q       All right.  Let's talk about the vehicle.  Did you see a car - - did you see a silver Mercedes-Benz?

A       Yeah, backed in.

Q       Backed into a parking place?

A       Uh-huh (affirmative response).

Q       And show us about where it was.

A       Kind of down here.

Q       I know you did this for me the other day in my office, but if you would, please, put an "X" where you saw the silver Benz.

A       (Witness complied with request.)

Q       You could clearly see it?

A       Yeah.

Q       Had you seen it before?

A       I seen a car before, but didn't pay no mind.  I thought it was a regular car that was backed in like the rest of them.

Q       You're sure it was a silver Mercedes-Benz?

A       Positive.

Q       And when you left - - when you and your sister left, was that car still there?

A       Yeah, that's when we seen it.  When we was leaving out, that's when we seen the car.

Q       So it was still there?

A       Uh-huh (affirmative response).  It was still there.

Q       Did you leave Stone Bridge Apartments?

A       Yes, I left.  I was going home and I made it to like U-Pack It, the gas station up the road.  And then I got a phone call saying there was a shooting back there and it was by my friend's house.

Q       So did you go back?

A     Yeah, I turned right around. And I called my sister while I was turning around. So we pulled up back at like the same time.

Ms. Preston testified that she saw the victim on the ground with people around him. The victim was still alive when she arrived, and she tried to keep him calm.

On cross examination, Ms. Preston clarified that she saw the Mercedes when she left her friend's apartment and walked to her car. Ms. Preston did not see anyone inside the vehicle and testified that the vehicle was turned off. Before the State rested, the parties stipulated that according to the emergency room records, the victim died at 10:39 p.m.

A review of the record in this case reveals that there was no direct evidence connecting the Briggs brothers to the victim's murder. The brothers concede that on the night of the shooting, they were at the Walmart in Abbeville and later at a Texaco station in Delcambre. There was only circumstantial evidence, however, as to where the brothers were between these two destinations and whether they shot the victim. Therefore, we must review the evidence in the light most favorable to the prosecution to determine whether every reasonable hypothesis of innocence was excluded.

The video footage placing Donald and Stefan Briggs at the scene of the crime was not very clear. Although Detective Guidry identifies the brothers in the Walmart video footage getting into a light colored sedan, they are not clearly identified again until the video from the Texaco station, where they are seen getting out of the light colored sedan. The light colored sedan at Texaco is identified as a Mercedes Benz. When narrating the video footage between Walmart and Texaco, the State's witnesses refer to the vehicle as a "light colored sedan" without stating definitively that it is the same sedan throughout. However, considering the video footage and Detective Guidry's narration in the light most favorable to the prosecution, there was

20

evidence that Donald and Stefan Briggs were near the scene of the murder at the time the murder was committed and left shortly thereafter. There was also evidence that the victim was shot from a moving vehicle and evidence to discount the victim being shot from the F-150 truck also leaving the scene. There was no evidence, however, that the brothers were connected to the victim.

In order to convict Donald Briggs for the second degree murder of Jazaylon Levy, the State had to prove each element of the crime beyond a reasonable doubt. In *State v. Alexander*, 22-1205 (La. 5/5/23), 362 So.3d 356, the supreme court determined that there was insufficient circumstantial evidence and affirmed the reversal of the defendant's conviction. In March 2002, Scott Paul Latiolais was killed by a shotgun wound to the back. *Id.* at 357. The State's theory was that Alexander and his cousin, Timothy Roberts, intended to rob Latiolais but shot him in the back when he tried to flee. *Id.* The following facts were discussed:

> Defendant, Roberts, the victim, and several witnesses all lived in the same area of Henderson in St. Martin Parish. Defendant [sic] was with Roberts on the night the crime occurred. That night, the victim approached Tony Mouton, who lived across the street from defendant and Roberts, wanting to buy $50 worth of crack cocaine. He had none, so Mouton asked Roberts if he had any to sell. Roberts did not. Roberts, who had been wearing a white t-shirt, went into this home and came out wearing a dark jacket. He and defendant, who was already wearing a long-sleeved jacket, pulled up their hoods and walked to a gravel path that cut through a nearby grassy field. About ten minutes later, the victim left Mouton's front yard and walked down the same gravel path. There he encountered defendant, Roberts, and Julius Charles, a mutual cousin of defendant and Roberts.

> According to Charles, the victim and Roberts stood apart from him and defendant talking. Suddenly, the victim ran, Roberts pursued him briefly, and then shot him in the back. Defendant, Roberts, and Charles all ran toward their respective homes. Roberts called Charles and told him not to say anything about the crime. Ignatius Patt, a cousin of Charles, testified that the next day he asked Charles if Roberts shot the victim and Charles said no. He then asked who did it, and Charles told Patt he did not know.

*Id.* at 358.

Initially, the State indicted Roberts for first degree murder, but the charge was dismissed when Alexander did not show up as a witness at trial. *Id.* The State obtained a second indictment against Roberts in 2008, but no trial occurred. *Id.* Reopening the investigation in 2012, the State searched for the murder weapon but found nothing, tested Roberts' and Alexander's clothing for gunshot residue, and interviewed Alexander two more times. *Id.* at 358–59. In 2014, the State indicted Alexander for second degree murder, arguing that he could be convicted either as the shooter or under a felony-murder theory. *Id.* at 359.

The only direct evidence of Alexander as the shooter occurred during a police interview wherein Alexander stated that he shot Latiolais. Alexander immediately clarified, however, that he meant to say that he saw Roberts shoot Latiolais. *Id.* The supreme court stated that "[t]his was the lone instance in the course of multiple interviews over an eleven-year period that [Alexander] implicated himself as the shooter." *Id.*

> Since such a brief misstatement by defendant was unlikely to win a conviction, the State based its case against defendant almost entirely on the presence of gunshot residue (GSR) on a blue Nike jacket collected from his house. The State sought to use this circumstantial evidence to establish that defendant shot or handled the gun used to kill Latiolais. Of course, if defendant was not wearing that jacket that night, the GSR is not relevant to defendant's involvement in this crime. For that reason, a rational juror must first determine from the evidence presented that defendant was wearing that particular jacket on the night of the crime, independent of the fact that it contained particles of GSR. However, as explained below, without firm evidence, the jury was left to choose between two equally likely possibilities. As a result, a conclusion that defendant wore that jacket must have rested on conjecture alone.

> The day after the crime, the police collected a variety of clothes from the homes of Roberts and defendant that fit the general description Mouton provided of what he saw them wearing the night before. Neither Mouton nor Charles identified the Nike jacket as what they saw defendant wearing. In statements to police shortly after the crime, both witnesses described defendant wearing a dark colored, hooded jacket. The blue Nike jacket does not have a hood. In 2012, ten years after the crime, defendant told the State Police detective he did not remember

what he and Roberts were wearing that night. Nine months later, in 2013, defendant was interviewed again. During that interview, the detective, without objective evidence of this, insisted that defendant was wearing the blue Nike jacket on the night of the crime. Defendant nodded, but demonstrated no independent recollection of what he was wearing that night. In the end, based on all of the evidence, the jury could only speculate as to whether defendant was wearing that jacket when the crime occurred.

Even if a rational juror *could* infer from this evidence that he wore the jacket on the night of the crime, the GSR nevertheless has limited evidentiary value in this case. The testing provided no information as to when or how the GSR got onto the jacket, nor from what firearm it originated. Furthermore, the Nike jacket is not the only piece of clothing collected from defendant's house that fit the description provided by the witnesses. The police also collected a dark hooded sweatshirt which later tested negative for GSR. Moreover, the Nike jacket is not the only dark, hooded jacket collected that contained gunshot evidence—GSR and a partially burned gunpowder particle were found on a sweatshirt collected from Roberts's house. Again, the evidence, such as it was, required the jurors to guess as to whether the GSR found on the Nike jacket came from the gun used to kill the victim.

The alternative theory proposed by the State was that defendant carried the gun to the field where he and Roberts laid in wait to rob the victim. To support the felony-murder theory, the State argued that the two men had just learned that the victim had $50, they were wearing dark clothes, and that the GSR on the jacket showed defendant hid the gun in his sleeve before passing it to Roberts who then shot the victim. As described above, jurors could only speculate as to whether the GSR on the Nike jacket connected defendant to the gun used in this crime. Furthermore, there was no evidence of any plan between defendant and Roberts to rob the victim. Defendant and Roberts walked down the gravel path through the field *before* the victim left Mouton's yard ten minutes later. The State presented nothing suggesting either man could have predicted that the victim would have followed them. Defendant told the State Police detective that he did not know where the victim lived.

Furthermore, Mouton told police that only Roberts went inside his home and came out dressed in long sleeves. If this is when the gun was acquired, then Roberts must have passed the gun to defendant first and then defendant must have passed it back to Roberts in the field. Yet neither Mouton nor Charles saw a gun in defendant's possession or passed between the two men. Finally, the motive of the crime was ostensibly to rob the victim, however, his wallet and over $200 in cash was on his person when he was found the next morning.

Considering all of the evidence in the light most favorable to the prosecution, no rational juror could find the State proved beyond a reasonable doubt that defendant either shot the victim or participated in

a plan to rob the victim. The State's circumstantial case against defendant failed to exclude every hypothesis of innocence. "A trial jury's inference that an accused aided and abetted in a crime cannot be 'mere speculation based upon guilt by association.' " *[State v.] Schwander*, 345 So.2d [1173] at 1175 [(La.1977)]. Based on this record, however, speculation based upon guilt by association is all the jury's inference can be. In light of the absence of evidence that defendant knew in advance of any plan to rob the victim, the only explanation for the jury finding defendant guilty in this case was based upon his association with Roberts. Accordingly, we affirm the decision of the appellate court, which reversed defendant's conviction.

*Id.* at 359–60 (footnote omitted).

In brief, the State asserts that as the driver of the Mercedes, Donald gave Stefan the opportunity to kill the victim; thus, Donald aided and abetted in the commission of the victim's murder. Although, no instruction on principals was given at trial, La.R.S. 14:24 provides that "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." Regarding the matter of principal liability:

Only those persons who knowingly participate in the planning or execution of a crime are principals to that crime. An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state, and the mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. However, it is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Page*, 08-531 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449, *writ denied*, 09-2684 (La. 6/4/10), 38 So.3d 299.

*State v. Alexander*, 21-641, p. 4 (La.App. 3 Cir. 5/25/22), 362 So.3d 599, 604, (quoting *State v. Petty*, 12-278, p. 11 (La.App. 5 Cir. 10/30/12), 103 So.3d 616, 623).

In this case, there was no evidence of any plan between Donald and Stefan to commit the drive-by shooting nor was there any evidence that Donald even knew

24

Stefan had a gun. Other than Detective Hargrave's testimony that Gavin Garnica was rumored to live in Unit 322, there was no evidence that Donald knew Gavin would be at Stone Bridge Apartments or knew that Gavin would be walking outside when they drove through.

In *State v. Bridgewater*, 00-1529 (La. 1/15/02), 823 So.2d 877, *cert. denied*, 537 U.S. 1227, 123S.Ct. 1266 (2003), the defendant was convicted of first degree murder by a jury. In reversing the conviction, the supreme court reasoned:

> At trial, the state advanced two possible scenarios for finding defendant guilty of first degree murder: (1) defendant and Jacobs both were shooters; or (2) Jacobs was the sole shooter, and defendant was a principal. Under the first scenario, the state was required to identify defendant as a shooter. Yet, as defendant stresses, the state's opening statement at trial was that we "may never know who fired these shots."

> Due to the lack of any eyewitnesses coupled with the equivocal physical evidence, suggesting only a possibility of multiple shooters, the state apparently realized that any attempt to identify the actual shooter would result in a "finger pointing" game between defendant and Jacobs. The state's case thus focused on the second scenario—that even if defendant was not the shooter, he acted in concert with Jacobs, and thus is guilty as a principal under La. R.S. 14:24. To prevail on its principal theory, the state had the burden of proving beyond a reasonable doubt that defendant harbored specific intent to kill the victims, not merely that defendant knew of Jacobs' intent to do so. The shooter's specific intent cannot be transferred to the principal; "[a]n individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." *State v. Pierre,* 93–0893 at p. 4 (La.2/3/94), 631 So.2d 427, 428; *State v. Holmes,* 388 So.2d 722, 726–27 (La.1980)(reasoning that "[p]roof of one person's intent is not proof of another's" and thus that to find non-shooter liable state was require to establish "the circumstances indicated that [non-shooter] also actively desired the death of or great bodily harm to the victim").

> In support of its principal theory, the state relies upon our recent holding in *State v. Anthony,* 98–0406 at p. 14 (La.4/11/00), 776 So.2d 376, 386, *cert. denied*, 531 U.S. 934, 121 S.Ct. 320, 148 L.Ed.2d 258 (2000), for the proposition that the state is not required to prove defendant actually pulled the trigger. In *Anthony, supra,* however, the evidence reflected the defendant's "participation was major;" the defendant "had, minimally, a neutral element of reckless indifference;" the defendant "intended from the outset to kill these victims;" and the defendant was armed. *Id.* The same cannot be said of the evidence in this case.

25

The circumstantial evidence the state relied on in this case to establish defendant's liability as a principal was as follows: (1) that defendant was in the Beaugh's neighborhood on the morning of the double homicide (as established by his own admission and by Ms. Menard's identification); (2) that defendant entered the Beaugh's residence and was armed, albeit with a broken BB gun (as established again by his own admissions); and (3) that defendant failed to prevent (or, as the state argues, attempt to prevent) Jacobs from committing the double homicide. Citing La. R.S. 14:10(1)'s reference to specific intent in terms of an offender's "failure to act," the state argues that the latter apparent failure to act sufficed to establish defendant's specific intent. We disagree.

As a general rule, "liability [as a principal] will not flow merely from a failure to intervene;" however, "silence in the face of a friend's crime will sometimes suffice when the *immediate proximity* of the bystander is such that he could be expected to voice some opposition or surprise if he were not a party to the crime." 2 Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* § 6.7(a)(1986)(Emphasis supplied). Defendant's statement that he was in the Beaugh's garage when the fatal shots were fired places him outside the "immediate proximity" of the double homicide and inside the general rule precluding a finding of liability as a principal based *solely* on a passive failure to intervene in a friend's criminal acts.

Our finding that the evidence is insufficient to establish defendant's liability as a principal is buttressed by the state's failure to present any evidence establishing defendant's specific intent to kill. No one testified that defendant had anything more than a broken BB gun; indeed, as noted, it was defendant who conceded that much. Ms. Menard, the neighbor, observed no weapons on either of the suspicious pair. This lack of evidence that defendant even was armed with a functional weapon reduces the state's circumstantial case to a request that the jury engage in speculation based merely upon "guilt by association." *Pierre,* 93–0893 at p. 6, 631 So.2d at 429.

Accordingly, we reject the state's contention that the jury reasonably could have found defendant liable as a principal based merely on his failure to prevent Jacobs from committing the double homicide. We hold that the state failed to exclude a reasonable hypothesis of innocence—that defendant was merely present—and, for that reason, we reverse defendant's conviction of first degree murder and death sentence.

*Id.* at 889–91.

While Donald was allegedly the driver in the present case, there was no evidence of a plan between him and Stefan to commit murder nor any evidence that Donald knew Stefan had a gun. Other than Gavin Garnica's statement that "them

26

boys" started shooting, there was also no eye-witness testimony as to the shooting itself. Thus, there was no evidence as to anything Donald might have done or said before, during, or after the shooting. Ms. Mouton testified that Donald was upset when he entered her car at the Texaco station, but she did not testify as to anything specific he said.

We find that the evidence was insufficient to convict Donald Briggs of second degree murder. Even if the jury reasonably inferred from the video evidence that the brothers were in the vicinity of the shooting at the time of the shooting and left shortly afterwards, the jury was required to speculate as to whether the shots were fired from the brothers' car. Given the lack of physical evidence connecting the brothers to the shooting, the absence of any weapon, the absence of any evidence connecting the brothers to the victim, and the ambiguous evidence connecting the brothers to Gavin Garnica, the jury's determination that the shots were fired from the brothers' vehicle was based on speculation rather than reasonable inferences. Furthermore, the evidence was not sufficient to prove Donald possessed the specific intent to kill. For these reasons, we reverse the conviction of Donald Briggs for second degree murder and vacate the corresponding sentence.

**DUE PROCESS/ FAIR TRIAL**

In his second assignment of error and third assignments of error, Donald asserts that the prosecutor denied due process by allowing false testimony and that he was denied a fair trial when the court allowed a relative of the victim to sit on the jury. Because we have determined that Donald's conviction should be reversed, these assignments of error are moot.

27

IV.

## **CONCLUSION**

We find that assignment of error number one has merit and that the evidence presented by the State was insufficient to support the conviction of Donald Briggs, III for second degree murder, a violation of La.R.S. 14:30.1. Therefore, the conviction is reversed, and the corresponding sentence of life imprisonment at hard labor without benefits is vacated and set aside.

**CONVICTIONS REVERSED AND SENTENCE VACATED.**

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-492 consolidated with 24-490


**STATE OF LOUISIANA**

**VERSUS**

**STEFAN JERMAINE BRIGGS**
**A/K/A STEFAN BRIGGS**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 69263
HONORABLE THOMAS J. FREDERICK, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**SHARON DARVILLE WILSON**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Sharon Darville Wilson, Gary J. Ortego, and Clayton Davis, Judges.


**CONVICTIONS REVERSED AND SENTENCE VACATED.**

**Aaron M. Meche**
**Assistant District Attorney**
**15th Judicial District, Vermilion Parish**
**100 N. State Street, Ste. 215**
**Abbeville, LA  70510**
**(337) 898-4320**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**Holli Herrle-Castillo**
**Louisiana Appellate Project**
**P. O. Box 2333**
**Marrero, LA  70073**
**(504) 345-2801**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Stefan Jermaine Briggs**

**WILSON, Judge.**

A jury found Defendant, Stefan Jermaine Briggs, guilty of second degree murder, in violation of La.R.S. 14:30.1. The trial court sentenced Mr. Briggs to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. Mr. Briggs now appeals his conviction. For the following reasons, we reverse the conviction and vacate the sentence.

I.

**ISSUES**

We must decide:

(1)    whether the evidence was insufficient to uphold the conviction for second-degree murder;

(2)    whether the trial court erred in denying the motion for new trial; and

(3)    whether the trial court erred in overruling the defense's objection to the evidence of uncharged other crimes.

II.

**FACTS AND PROCEDURAL HISTORY**

On July 14, 2022, Jazaylon Levy was shot while walking outside of an apartment in the Stone Bridge apartment complex in Abbeville, Louisiana. He later died from his injuries. On October 31, 2022, Stefan Briggs and his brother, Donald Briggs, were each charged by a single grand jury indictment with one count of second degree murder, a violation of La.R.S. 14:30.1. A two-day jury trial commenced on August 29, 2023, after which both Stefan and Donald were found guilty as charged.

On March 28, 2024, the trial court denied Stefan's post verdict judgment of acquittal and motion for new trial. After waiving sentencing delays, both Stefan and

Donald were sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On April 8, 2024, Stefan Briggs, through counsel, filed a notice of appeal which was granted the same day.

III.

## LAW AND DISCUSSION

### ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent.

There is a conflict between the sentencing minutes, Uniform Sentencing Commitment Order, and the transcript of sentencing. Both the minutes of sentencing and the Uniform Sentencing Commitment Order state the trial court ordered Stefan's sentence to run concurrently with any other sentence he was presently serving. No such statement is reflected in the transcript. Given our decision to reverse the conviction and vacate the sentence, however, this error patent is moot.

### INSUFFICIENT EVIDENCE

In his first assignment of error, Stefan contends that the evidence was insufficient to prove his identity as the offender and to prove that he had the specific intent to kill or commit great bodily harm.

The analysis for sufficiency of the evidence is well settled:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the

2

appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson,* 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp,* 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be inferred according to reason, experience and common sense." *State v. Burns,* 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams,* 13–497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied,* 13–2774 (La.5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859.

Stefan Briggs was charged with second-degree murder, a felony in violation of La.R.S. 14:30.1. Specifically, Stefan was tried under La.R.S. 14:30.1(A)(1), which is defined as the killing of human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Specific intent is defined as "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). In addition to proving the statutory elements of the charged offense at trial, the State is required to prove the defendant's identity as the perpetrator.

When a key issue at trial is whether the defendant was the perpetrator of the crime, the State is required to negate any reasonable probability of misidentification in order to carry its burden of proof beyond a

reasonable doubt. *State v. Smith,* 430 So.2d at 45; *see also State v. Brady,* 414 So.2d 364, 365 (La.1982); *State v. Long,* 408 So.2d 1221, 1227 (La.1982). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. *State ex rel. Graffagnino v. King,* 436 So.2d 559 (La.1983). However, we are mindful that the touchstone of *Jackson v. Virginia* is rationality and that "irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *State v. Mussall,* 523 So.2d at 1310.

*State v. Bright*, 98-0398, pp. 22–23 (La. 4/11/00,), 776 So.2d 1134, 1147.

The State contends that the Briggs brothers committed the murder of Jazaylon Levy by shooting from a moving vehicle, and that their intended target was actually an individual by the name of Gavin Garnica, who was standing outside of the apartment complex with Mr. Levy. Specifically, the State contends that as the driver, Donald gave his brother, Stefan, the opportunity to kill the victim; thus, Donald aided and abetted in the commission of the victim's murder. The State further contends that the brothers' motives and specific intent to kill were demonstrated by testimony regarding animosity between the brothers and affiliates of Gavin Garnica.

To support its case, the State presented several witnesses. Detective Lon Hargrave was the first to testify at trial. Detective Hargrave testified that he resided in and was a courtesy security officer for the Stone Bridge Apartments on the night of the murder. While taking out his trash, a little after 9:00 p.m., Detective Hargrave heard ten gunshots. Detective Hargrave dropped his bags of trash, retrieved his duty weapon, and began walking toward the area of the gunshots. Detective Hargrave found the victim lying on the ground in the parking lot. According to Detective Hargrave, the victim was awake but not alert.

Detective Hargrave concluded that the shooting was a drive-by shooting and explained why the vehicle must have been moving at the time:

4

A      Yes, sir.  It would have had to have been going north to south based on the - - later on, once Jazaylon had passed, I was called back. They said, "Hey, can you help us get in an apartment?  We want to look at the rendering of an apartment marked 313 just immediately above where Jazaylon was."  That was the apartment he was standing in front of.  That apartment - - I don't remember the lease holder's name.  She wasn't home at the time.  That apartment immediately took gunfire obviously, multiple rounds in the residence.

I was able to - -  if you understand trajectory - - the line where the bullet goes - - I was able to determine some rounds came from north to south; some came straight on.  Some came south to north.

Q      That would indicate a moving vehicle?

A      It would.  It also, to me, indicated, based on my training and experience, that the rounds that came south to north were higher, which if you know a rifle, the rifle is going to climb as you shoot.  So that tells me that the shots that were south to north came after the ones that came - - I'm sorry.  The shots that came north to south came after the ones that came south to north.

Q      Assume that the entry wound in Jazaylon's body was on his right upper buttocks.  That would indicate to you this was one of the earlier shots?

A      I actually think, because of the position of the vehicle, it was going to be a shot more in the middle of the thihgh [sic].  I believe the first thing that got shot was either the building or the red vehicle.

After describing the various bullet holes found near the scene, Detective

Hargrave further testified:

A      Yes, Sir.  Based on everything that I saw, my training, my experience, the shootings I've worked with APD, the sheriff's office, everything pointed to a vehicle moving at a moderate pace, decent pace, nothing crazy, south in that lane of Stone Bridge - - that final driveway. The rounds started southern, continued and finalized north before the vehicle was out of that area.  Everything points to - - it all coming out of one vehicle moving at a constant speed.  The rounds that I remember hearing were back to back.  There was no gap.  There was no alternating pitch where it could have been more than one weapon.  One weapon. One vehicle.  One path.

Q      So if Jazaylon was facing the driveway when the shooting started, the vehicle would have been coming from his left?

A      Yes, sir, which I would assume a normal reaction would be the second that first shot rang, he probably turned around which would

5

have caused that - - you had said the higher up shot.  I'm assuming he turned to run from the gunshots and that's when he was hit.

When asked if he saw evidence of gunshot damage in the apartment, Detective Hargrave responded, "Absolutely."

Detective Hargrave's investigation revealed that an individual by the name of Gavin Garnica was with the victim at the time of the shooting.  According to the detective, "[t]here was rumor and conjecture" that Mr. Garnica was staying in Unit 322.  During an interview after the murder, Mr. Garnica thanked Detective Hargrave for the care he gave the victim after the shooting.  Mr. Garnica then stated that he was present during the shooting and received a "grazing gunshot to the leg." According to Detective Hargrave, Mr. Garnica was not cooperative, "[o]utside of saying that he was out there when 'them boys started shooting.'"

The next witness was Detective Trent Guidry who was employed with the Abbeville Police Department at the time of the shooting.  Detective Guidry testified that he knew both Defendants and identified them in court.  In connection with his investigation, Detective Guidry viewed video from the following locations: the Abbeville Walmart, Stone Bridge Apartments and the adjacent The Havens apartment complex, the Red Barn building on Rodeo Road, the Abbeville Motel 6, and the Texaco station in Delcambre.  According to Detective Guidry, Walmart was approximately half a mile from Stone Bridge Apartments, and it would have taken someone about one minute to travel from Walmart to Stone Bridge.

The video footage was compiled into a single DVD which was introduced as State's Exhibit 7.  While the video was played for the jury, Detective Guidry and the State had the following colloquy:

> Q    Detective Guidry, we're going to show this video to the jury.  But I'm going to ask you at certain points in the video what you see in the video, all right?

A    Okay.

Q    Let's begin.  Can you tell me what this location is?

A    That is the Wal Mart parking lot.

Q    And you observe a vehicle pulling in?

A    I do.

Q    Can you describe it?

A    It is a light colored sedan, silver sedan - - I'm sorry - - light colored sedan.

Q    Can you describe what you see?

A    Two individuals that exited the light colored sedan, one wearing a white shirt and one wearing a black shirt walking into Wal Mart.

Q    Can you describe what you see in the video?

A    Yes, the same two individuals that exited the sedan, the white shirt and the black shirt.

Q    Can you identify these individuals?

A    Yes, the white shirt - - is Donald Briggs, III and the one wearing the black shirt is Stefan Briggs.

Q    Are these the same two individuals?

A    Yes.

Q    What time are we looking at here?

A    That is 9:15 P.M.

Q    Did you determine whether the Wal Mart time stamp clock was accurate?

A    Yes, sir.

Q    Describe what you see here.

A    That is the same two individuals walking back to their vehicle.

Q    Can you describe who gets in the driver's seat?

A    Yes, sir.  Donald Briggs, III.

7

Q      And the passenger seat?

A      Stefan Briggs.

Q      What do you see here?

A      The same - - the vehicle they just entered in now leaving.

Q      And headed towards what street?

A      Broadmoor.

Q      Does Broadmoor connect to Rodeo?

A      Yes, sir.

Q      Where does the vehicle turn?

A      Towards Rodeo Road.

Q      When you see the next event, describe it.  What's that location?

A      That's the entrance to Stone Bridge Apartments.

Q      You see a vehicle entering Stone Bridge?

A      Yes, a light colored sedan entering the Stone Bridge.

Q      Did you determine whether the Stone Bridge time stamp clock was accurate?

A      It was not.

Q      Describe what you see.

A      That is an exit driveway for Stone Bridge.

Q      Continue.  Stop.  What did we just hear?

A      Gunshots.

Q      Approximately how many?

A      Ten.

Based on the running time on the Stone Bridge time stamp clock, Detective Guidry determined that nine to eleven minutes elapsed between the time the light colored sedan entered Stone Bridge and the time the gunshots were heard.

When it played the video form the Havens apartments, the State noted an exit driveway from Stone Bridge and asked Detective Guidry what he saw:

A    So that is a light colored sedan passing around a white Ford F-150 as it enters the exit gates towards Rodeo Road.

Q    So this light colored sedan actually passed another vehicle to try to get to the gate?

A    Yes.

Q    Describe what this is.

A    So the light colored sedan that passed up the white truck also passed the first vehicle you saw as it was passing towards the exit. The first vehicle that passed in front of the white truck, it also overtook that vehicle as it exited.

Q    Now, the light colored vehicle, when it got to Rodeo, turned which way?

A    That would be northeast.

Q    Left or right?

A    Left.

Q    Describe this.

A    The first vehicle was traveling from Highway 14. The second vehicle is the light sedan that exited Stone Bridge as it continues down Rodeo.

Q    Is that light colored vehicle going back in the same direction it came from?

A    Yes.

Q    Going back east?

A    Correct.

Q    What is this location?

A    That is Motel 6 located near the airport.

Q    And describe what you see.

A    Light colored sedan traveling eastbound on Highway 14.

9

Q       Was that clip almost immediately after the vehicle exited Stone Bridge, that light colored vehicle?

A       Yes, sir, very soon afterward.

Q       What is this location?

A       That is the Texaco station in Delcambre located at Highway 89 and Highway 14.

Q       What is this vehicle?

A       That's a Toyota Camry.

Q       What is the second vehicle, the light colored vehicle, that just came in?

A       You're asking me to describe the model?

Q       Yes, sir.

A       That is a Mercedes Benz.

Q       Do you recognize the individuals exiting the Mercedes?

A       Yes.

Q       Who is the driver?

A       Donald Briggs, III.

Q       Who is that getting in the driver's seat of the Mercedes?

A       Stefan Briggs.

Q       Which way is the Mercedes going?

A       Towards the East.

Q       And the Toyota?

A       The Toyota leaves traveling north on 89.  The Mercedes leaves traveling East on 14.

Through his investigation, Detective Guidry learned that the driver of the Toyota Camry was Nyesha Mouton, who was in a relationship with Donald Briggs. Detective Guidry identified State's Exhibit 8 as a picture of the Mercedes driven by Donald Briggs.

10

Detective Guidry further testified that there were well-defined groups of people between which there was gun violence in Abbeville. "Group A" was associated with an individual named Roland Bernard, III, while "Group B" was associated with the Briggs brothers. Detective Guidry testified that there was animosity between the two groups, resulting in gun violence between them. The State referred Detective Guidry to an incident in September of 2020 wherein Stefan Briggs was wounded. He described the incident as follows:

> A    Stefan and his brother, Donald, were traveling in a vehicle in the area of Martin Luther King and South Lamar Street. While they were traveling in the vehicle, a shooting took place. Stefan was shot in his hand and Donald drove him to the emergency room, dropped him off and went after the shooter.

According to Detective Guidry, Stefan did not cooperate in the investigation of the shooting. Based on his experience and expertise, he opined that a shooting victim's lack of cooperation usually indicated "[p]otential retaliation." When asked if he was able to determine who fired the shot, Detective Guidry answered, "No, sir. There was a suspect mentioned as Roland Bernard, III." Detective Guidry testified that Roland Bernard's father was executed in his driveway in November of 2020. Numerous shots were fired, and two different caliber casings indicated two shooters.

In December of 2020, Detective Guidry received a report of another shooting involving Stefan Briggs:

> A    During this incident, Donald and his brother, Stefan, were traveling in a vehicle in the area of Seventh Street - - Seventh or Eighth Street, South Louisiana area. While they were traveling in the vehicle, shots were fired at the vehicle and Stefan was struck in his face with a 7.62 caliber rifle.

Once again, Detective Guidry testified that Stefan did not cooperate in the investigation. Additionally, Detective Guidry testified that Gavin Garnica was affiliated with Roland Bernard, III. Finally, Detective Guidry testified that Stefan

11

Briggs had recently been involved in an altercation at the jail with another person affiliated with Roland Bernard, III.

On cross-examination, Detective Guidry agreed that the police did not determine Roland Bernard to be the one who shot Stefan. Additionally, Detective Guidry agreed that the video showing the Texaco station did not have a time or date stamp.

The following colloquy then took place on redirect:

Q     When you originally viewed the Texaco video, was that at the Texaco station?

A     Yes, sir.

Q     And did it have a time stamp on it?

A     Yes, sir.

Q     Did you use that along with the other video to establish a time line?

A     Yes, sir.

Q     And were you able to determine approximately how long between the shooting - - the actual shooting - - the sounds of the shooting and the exiting of the vehicle from the light colored sedan from Stone Bridge to the time it arrived at Texaco?

A     Yes, sir.

Q     How long was that?

A     Approximately ten to eleven minutes.

Q     Did you attempt to recreate the route?

A     Yes, sir.

Q     At the time, was Texaco your destination?

A     The Delcambre Bridge was my destination.

Q     You just timed it?

A     I did.

12

Q     And the Texaco station from the bridge is what?

A     Maybe - - I don't know.

Q     Half a mile?

A     Three-quarters - - I mean, a quarter of a mile to a half a mile.

Q     And driving normal highway speeds from the Stone Bridge Apartments to Highway 14 and then to the Delcambre bridge took you how long?

A     Approximately nine minutes and twenty seconds, nine minutes, thirty seconds. That's considering there's four traffic lights and traffic.

Q     Roughly the same amount of time you calculated the vehicle - - the shooting - - the time the vehicle - - the light colored vehicle left Stone Bridge and the time the Mercedes arrived at Texaco?

A     Yes, sir.

Q     And the light colored vehicle was headed in the direction of the Texaco station?

A     Yes, sir.

The next witness, Nyesha Mouton, testified that she saw Donald Briggs the night of July 14, 2022. According to Ms. Mouton, Donald originally asked her to meet him at a bargain furniture place but then changed the meeting place to "[t]he Texaco" in Delcambre. Ms. Mouton testified that she drove a brown Toyota Camry to the Texaco station, where Donald arrived in a silver Mercedes. Stefan, was also in the car. According to Ms. Mouton, Donald got into her car and drove to IHOP in Lafayette. When asked to describe Donald's mood, Ms. Mouton replied, "He was upset, talking to himself." Ms. Mouton dropped Donald off at Willowind Apartments where Donald's cousin lived. Ms. Mouton stated that Donald did not talk in the car.

Dr. Christopher Tape, accepted as an expert in the field of forensic pathology, performed an autopsy on the victim. Looking at a diagram, Dr. Tape identified a

13

single gunshot entry wound to the right buttocks. Dr. Tape further testified about the trajectory of the gunshot:

> A      It goes through the pelvis; you can see that. It exits here, left anterior thigh, just across the pelvis. Slightly irregular 0.8 centimeters, about eight centimeters left of midline. And this is at the same inferior superior level as the entry. Its [sic] going basically straight across. Trajectory back right to left, upward and downward.
>
> But now keep in mind, that this trajectory - - this is not so much moving, but its [sic] essentially going straight across there. Just keep in mind that I'm making my measurements in an anatomic position. So you can see its [sic] roughly halfway up the body - - probably more than halfway up the body, going straight across the hips there.
>
> There's an abrasion here on the right ankle and there's also an abrasion here above the entry wound. There's nothing else, no other injuries. This is not to scale, representative only.

Dr. Tape agreed that his report indicated the victim was seventy-one inches, or "[f]ive, eleven." Based on the victim's height, Dr. Tape opined that the victim was standing upright when the bullet entered his body. According to Dr. Tape, the bullet entry wound was "[s]omewhere around three of four feet at least" or "[a]bout half [the victim's] length" from the ground. Dr. Tape concluded that the victim's cause of death was "blood loss from damage to the artery."

The State then recalled Detective Hargrave who agreed that the video he watched showed a small light colored sedan first exit the Stone Bridge Apartment complex the night of the shooting, followed by a full-sized pickup truck. When asked if he saw any other vehicles exit the parking lot "besides the one that was already in the driveway when the shots were fired," Detective Hargrave answered, "Only those." Detective Hargrave was then asked if he measured the window sill height of a Ford F-150, and the detective answered:

> A      I was able to get multiple makes and models. The average that I saw from that top of that door frame was about four foot, four inches or four foot, seven inches of various makes, models and years. It all averaged about that.

Q      So anywhere from fifty-two to fifty-seven inches?

A      Around.

The following colloquy then took place:

Q      And you heard Dr. Tape - - maybe you didn't hear him - - but Dr. Tape testified that the trajectory of the bullet that killed Mr. Levy was straight on with no up or down angle.  You've seen that before?

A      The autopsy, yeah.

Q      So if a bullet was fired from the lowest point in the F-150 - - let's say fifty-two inches - - at a man who's five feet, eleven, approximately where would it strike him?

A      Middle torso.

Q      Not below the waist?

A      I'm six, two.  So at four a [sic] half feet of my body, I mean, that's middle torso all day.

Q      Now, did you also compare the heights on a vehicle similar to the one that was seen at the Texaco station driven by the defendant?

A      Yes, sir.

Q      And that is a Mercedes-Benz C300?

A      C class, yes.

Q      And did you find one?

A      Yes, sir.

Q      The Briggs vehicle is 2009 model.  Did you locate a 2009 model?

A      I did, sir.

Q      Where did you find it?

A      At Mercedes-Benz of Lafayette on Johnston Street.

Detective Hargrave confirmed that the vehicle he examined was a white 2009 Mercedes-Benz C Class.  Detective Hargrave also identified a photograph showing the front passenger door of the Mercedes-Benz with a tape measure going from the ground to the window sill.  Detective Hargrave noted that the tape measured "right

15

around thirty-seven inches, give or take a few millimeters." Detective Hargrave's testimony continued:

Q    And you're six, two?

A    Yes, sir.

Q    Did you measure on your own body about where that reflected?

A    It was - -

Q    You can stand up.

A    For me, standing up next to the vehicle, it would have put approximately in this area.

Q    Where your left hand is?

A    Yeah. In between - - depending on shoes and everything, it would have been in that general belt line area.

On re-cross examination, Detective Hargrave testified that when he watched the video, he saw three people leaving Stone Bridge. Detective Hargrave agreed that there were plenty of other vehicles in the complex prior to and after the shooting. When asked if he measured the window distance of any other vehicles, Detective Hargrave replied:

A    I calculated - - no. But to elaborate, I calculated the distance of

the vehicles that were moving at the time of the incident, the F-150 and

the Mercedes-Benz.

Q    Three vehicles you saw leaving?

A    Correct.

Q    Not all the vehicles inside the complex?

A    Correct.

After confirming that the detective was six feet two inches, defense counsel asked him to show the jury again where the bullet would have hit him. The detective

pointed to an area, but the record does not reflect the area to which he was pointing.

The following colloquy ensued:

> Q  So it's safe to say that at five foot, eleven, three inches shorter, it would probably would have come up towards - - you know, lower back to mid-back, wouldn't you agree?
>
> A  I could only say where I think it would hit me based on the window sill where it would be.
>
> Q  And you have six foot, two frame?
>
> A  Yeah.

Continuing on cross-examination with the other defense counsel, the following colloquy ensued:

> Q  You stated that you only measured vehicles that matched more or less the description of the vehicles that you saw in the clip that you received from the state, correct?
>
> A  Uh-huh (affirmative response).
>
> Q  But you were on the scene.  And when you came shortly after the shooting, you didn't see any other vehicles leaving, right?
>
> A  Correct.
>
> Q  But you did see other vehicles in the parking lot, correct?
>
> A  Correct, yeah.
>
> Q  And you're not saying that these measurements excludes the possibility of gunshots coming from any other kind of similar vehicle as to what you saw, correct?
>
> A  Unless it came from a parked vehicle that was still on the scene - -
>
> Q  Yes.
>
> A  - - When I came out, then there would be no other ones.  But the only vehicle that departed between the shooting and me coming on scene I would have seen them leave was those three.

As for the possibility that the shots could have been fired from a vehicle other than the three shown in the video, the testimony continued as follows:

17

Q      So what I'm asking is, you're only measuring the vehicles that you saw leaving?

A      Correct.

Q      But you're not excluding the possibility that the vehicle which fired the shot could have still be [sic] on scene?

A      It's possible, but again, we're also talking about my two vehicles, my personal vehicle and my department vehicle, my neighbors who came outside when the shooting happened.  They weren't in their vehicles.  There are other vehicles in that generic area, but to say - - plus the vehicle that got shot would have been Mr. Gernekus Peeple from 322.

There are multiple vehicles there, but I do not see the ability for any other vehicle that was currently parked there to have been involved in the shooting.

Q      But you weren't there; you didn't see it?

A      Correct.  At the time of the shooting, no, correct.

The final witness to testify was Kashawna Preston, a person who knew the victim and was at Stone Bridge Apartments the night of the shooting.  Ms. Preston was with several people, including the victim and Gavin Garnica.  Right before the shooting, Ms. Preston and her sister were walked to their cars by the victim, Mr. Garnica, and a teenager by the name of Javian.  Ms. Preston and her sister were in separate cars and left at about the same time.  Ms. Preston testified that she pulled out first, and her sister pulled out right behind her.  Regarding other cars in the parking lot, Ms. Preston testified as follows:

Q      When you walked out to get in your car in the parking lot, could you look down there and see if any other cars were parked?

A      Yeah, you walk out and to the left, you see all the cars that was parked.  That's how I noticed the vehicle.

Q      All right.  Let's talk about the vehicle.  Did you see a car - - did you see a silver Mercedes-Benz?

A      Yeah, backed in.

Q      Backed into a parking place?

18

A       Uh-huh (affirmative response).

Q       And show us about where it was.

A       Kind of down here.

Q       I know you did this for me the other day in my office, but if you would, please, put an "X" where you saw the silver Benz.

A       (Witness complied with request.)

Q       You could clearly see it?

A       Yeah.

Q       Had you seen it before?

A       I seen a car before, but didn't pay no mind.  I thought it was a regular car that was backed in like the rest of them.

Q       You're sure it was a silver Mercedes-Benz?

A       Positive.

Q       And when you left - - when you and your sister left, was that car still there?

A       Yeah, that's when we seen it.  When we was leaving out, that's when we seen the car.

Q       So it was still there?

A       Uh-huh (affirmative response).  It was still there.

Q       Did you leave Stone Bridge Apartments?

A       Yes, I left.  I was going home and I made it to like U-Pack It, the gas station up the road.  And then I got a phone call saying there was a shooting back there and it was by my friend's house.

Q       So did you go back?

A       Yeah, I turned right around.  And I called my sister while I was turning around.  So we pulled up back at like the same time.

Ms. Preston testified that she saw the victim on the ground with people around him.  The victim was still alive when she arrived, and she tried to keep him calm.

On cross examination, Ms. Preston clarified that she saw the Mercedes when she left her friend's apartment and walked to her car. Ms. Preston did not see anyone inside the vehicle and testified that the vehicle was turned off. Before the State rested, the parties stipulated that according to the emergency room records, the victim died at 10:39 p.m.

Stefan argues there was no direct evidence identifying him or his brother as possible shooters or showing they had any involvement in the shooting. Additionally, Stefan argues that the circumstantial evidence failed to exclude every reasonable hypothesis of innocence. Conceding that the brothers were at the Walmart parking lot, Stefan asserts there is no proof that the car that pulled into the apartment complex was the same car as the one that the Briggs brothers drove out of the Walmart parking lot. Since Detective Guidry was limited by the trial court to identifying the car in the video compilation as a light colored sedan, Stefan argues that unless there is only one light-colored sedan in all of Abbeville, there is no proof that the car driven by the brothers is the same car seen in the other videos. Stefan further argues that even if the car was the same throughout the video, it would only potentially prove that the Briggs brothers may have been in the area around the time of the shooting but there was no evidence that either one of them shot at anyone.

As for Ms. Preston's testimony that she observed an unoccupied silver Mercedes backed into a parking spot at the complex, Stefan contends that there was no testimony that Ms. Preston knew of or was familiar with either of the Briggs brothers or their vehicle.

According to Stefan, the State failed to negate several reasonable hypotheses of innocence. First, anyone in the complex could have shot the victim, a fact that Stefan claims Detective Hargrave acknowledged, despite the detective's opinion that the shots were fired from a moving vehicle. Second, although Detective Hargrave

20

focused on the cars exiting the complex, Stefan asserts that fleeing is a normal response to hearing a series of gunshots. Third, Stefan refutes Detective Hargraves's theory that the Mercedes had the only car window at the right height for the gunshot. He contends there were numerous other vehicles in the complex from which the shots could have been fired and contends Detective Hargrave's theory was based on an incorrect assumption that the only two vehicles in existence that could possibly have fired the shots were the two leaving the complex.

Rebutting Detective Hargrave's measurement calculation, Stefan states the following:

> Additionally, while Hargrave insisted the shots could only have been fired from the Mercedes, he also admitted that while his calculation was based on where the bullet would strike a person 6'2 such as himself, i.e. at the belt line, he was unable to calculate that the bullet would have hit Mr. Levy, who was 5'11, in the lower to mid-back. R.P. 333. The shot that struck Mr. Levy was fired into his hip/buttock area. Based on Hargrave's calculations, if the shots were in fact fired from a vehicle, that vehicle had to have windows lower than the Mercedes in question.

> Thus, the measurements provided by Hargrave not only do not provide evidence establishing the Mercedes was the vehicle of the shooter, but supports that the Mercedes could not have been involved.

As for Detective Guidry's testimony regarding the brothers' gang affiliation, Stefan asserts the State failed to present any physical or corroborating evidence to establish such affiliation. Stefan suggests that Detective Guidry's familiarity with the rival gangs and his personal knowledge of the Briggs brothers indicate his own potential reason for attempting to force the evidence to fit his theory—he knew Stefan and Donald Briggs personally and possibly wanted to put them away. Considering the State's theory that individuals involved in gang activity lived at the apartment complex, Stefan asserts the complex was full of people who could have had a motive to commit the shooting.

Finally, Stefan contends that since there was no evidence that Donald was involved in the shooting, there was also no evidence implicating him as a principal. Thus he contends that his conviction and sentence should be vacated.

According to the State, this case is not about misidentification:

> This case is not about Misidentification. At trial, defense counsel conceded that it was, in fact, the Briggs brothers who were seen on July 14, 2022, arriving at Wal-Mart in Abbeville in their silver Mercedes. Defense counsel also conceded the fact that the Briggs brother later arrived at the Texaco station in Delcambre. The State presented evidence that the same silver Mercedes that the Briggs brothers travelled to these destinations in was also seen travelling directly from Wal-Mart down Rodeo Road towards Stone Bridge apartment complex. The Briggs brothers' vehicle was then seen overtaking a Ford F-150 to quickly exit the gate of the apartment complex immediately after ten shots are heard.

> Detective Hargrave testified that he concluded a drive-by shooting had occurred. Based on this information, Detective Hargrave measured the windowsills of the same models of the two vehicles that were seen exiting the apartment complex after the shooting. With the victim's autopsy showing that the bullet had travelled "straight across" the victim's body with no upward or downward angle, Detective Hargrave was able to conclude that a bullet fired from the windowsill of a Ford F-150 could not have struck the victim below the waste [sic] if he were the same height as the victim (five foot eleven inches).

> The only other vehicle seen exiting the apartment complex immediately after the shots were fired was the silver Mercedes driven by Donald Briggs, III, which Appellant was a passenger. Detective Hargrave testified that he also measured the windowsill height of a 2009 Mercedes-Benz C300, like the vehicle driven by Donald Briggs, III, and found it to be approximately 37 inches from the ground. Detective Hargrave testified that he concluded that a bullet fired from that height would hit a man at the "belt line area". This evidence is consistent with Dr. Tape's testimony that the bullet entered and exited the victim's body travelling "straight across" his hips and that the wound was "roughly halfway up the body."

As the passenger of the Mercedes, the State contends Stefan was directly involved in the shooting of the victim. The State further contends that the brothers' motives and specific intent to kill were demonstrated by Detective Guidry's testimony regarding the animosity between the brothers and affiliates of Gavin Garnica, who was with the victim at the time of the shooting.

22

A review of the record in this case reveals that there was no direct evidence connecting the Briggs brothers to the victim's murder. The brothers concede that on the night of the shooting, they were at the Walmart in Abbeville and later at a Texaco station in Delcambre. There was only circumstantial evidence, however, as to where the brothers were between these two destinations and whether they shot the victim. Therefore, we must review the evidence in the light most favorable to the prosecution to determine whether every reasonable hypothesis of innocence was excluded.

The video footage placing Donald and Stefan Briggs at the scene of the crime was not very clear. Although Detective Guidry identifies the brothers in the Walmart video footage getting into a light colored sedan, they are not clearly identified again until the video from the Texaco station, where they are seen getting out of the light colored sedan. The light colored sedan at Texaco is identified as a Mercedes-Benz. When narrating the video footage between Walmart and Texaco, the State's witnesses refer to the vehicle as a "light colored sedan" without stating definitively that it is the same sedan throughout. However, considering the video footage and Detective Guidry's narration in the light most favorable to the prosecution, there was evidence that Donald and Stefan Briggs were near the scene of the murder at the time the murder was committed and left shortly thereafter. There was also evidence that the victim was shot from a moving vehicle and evidence to discount the victim being shot from the F-150 truck also leaving the scene. There was no evidence, however, that the brothers were connected to the victim.

In order to convict Stefan Briggs for the second degree murder of Jazaylon Levy, the State had to prove each element of the crime beyond a reasonable doubt. In *State v. Alexander*, 22-1205 (La. 5/5/23), 362 So.3d 356, the supreme court determined that there was insufficient circumstantial evidence and affirmed the

reversal of the defendant's conviction. In March 2002, Scott Paul Latiolais was killed by a shotgun wound to the back. *Id.* at 357. The State's theory was that Alexander and his cousin, Timothy Roberts, intended to rob Latiolais but shot him in the back when he tried to flee. *Id.* The following facts were discussed:

> Defendant, Roberts, the victim, and several witnesses all lived in the same area of Henderson in St. Martin Parish. Defendat [sic] was with Roberts on the night the crime occurred. That night, the victim approached Tony Mouton, who lived across the street from defendant and Roberts, wanting to buy $50 worth of crack cocaine. He had none, so Mouton asked Roberts if he had any to sell. Roberts did not. Roberts, who had been wearing a white t-shirt, went into this home and came out wearing a dark jacket. He and defendant, who was already wearing a long-sleeved jacket, pulled up their hoods and walked to a gravel path that cut through a nearby grassy field. About ten minutes later, the victim left Mouton's front yard and walked down the same gravel path. There he encountered defendant, Roberts, and Julius Charles, a mutual cousin of defendant and Roberts.

> According to Charles, the victim and Roberts stood apart from him and defendant talking. Suddenly, the victim ran, Roberts pursued him briefly, and then shot him in the back. Defendant, Roberts, and Charles all ran toward their respective homes. Roberts called Charles and told him not to say anything about the crime. Ignatius Patt, a cousin of Charles, testified that the next day he asked Charles if Roberts shot the victim and Charles said no. He then asked who did it, and Charles told Patt he did not know.

*Id.* at 358.

Initially, the State indicted Roberts for first degree murder, but the charge was dismissed when Alexander did not show up as a witness at trial. *Id.* The State obtained a second indictment against Roberts in 2008, but no trial occurred. *Id.* Reopening the investigation in 2012, the State searched for the murder weapon but found nothing, tested Roberts' and Alexander's clothing for gunshot residue, and interviewed Alexander two more times. *Id.* at 358–59. In 2014, the State indicted Alexander for second degree murder, arguing that he could be convicted either as the shooter or under a felony-murder theory. *Id.* at 359.

The only direct evidence of Alexander as the shooter occurred during a police interview wherein Alexander stated that he shot Latiolais. Alexander immediately clarified, however, that he meant to say that he saw Roberts shoot Latiolais. *Id.* The supreme court stated that "[t]his was the lone instance in the course of multiple interviews over an eleven-year period that [Alexander] implicated himself as the shooter." *Id.*

Since such a brief misstatement by defendant was unlikely to win a conviction, the State based its case against defendant almost entirely on the presence of gunshot residue (GSR) on a blue Nike jacket collected from his house. The State sought to use this circumstantial evidence to establish that defendant shot or handled the gun used to kill Latiolais. Of course, if defendant was not wearing that jacket that night, the GSR is not relevant to defendant's involvement in this crime. For that reason, a rational juror must first determine from the evidence presented that defendant was wearing that particular jacket on the night of the crime, independent of the fact that it contained particles of GSR. However, as explained below, without firm evidence, the jury was left to choose between two equally likely possibilities. As a result, a conclusion that defendant wore that jacket must have rested on conjecture alone.

The day after the crime, the police collected a variety of clothes from the homes of Roberts and defendant that fit the general description Mouton provided of what he saw them wearing the night before. Neither Mouton nor Charles identified the Nike jacket as what they saw defendant wearing. In statements to police shortly after the crime, both witnesses described defendant wearing a dark colored, hooded jacket. The blue Nike jacket does not have a hood. In 2012, ten years after the crime, defendant told the State Police detective he did not remember what he and Roberts were wearing that night. Nine months later, in 2013, defendant was interviewed again. During that interview, the detective, without objective evidence of this, insisted that defendant was wearing the blue Nike jacket on the night of the crime. Defendant nodded, but demonstrated no independent recollection of what he was wearing that night. In the end, based on all of the evidence, the jury could only speculate as to whether defendant was wearing that jacket when the crime occurred.

Even if a rational juror *could* infer from this evidence that he wore the jacket on the night of the crime, the GSR nevertheless has limited evidentiary value in this case. The testing provided no information as to when or how the GSR got onto the jacket, nor from what firearm it originated. Furthermore, the Nike jacket is not the only piece of clothing collected from defendant's house that fit the description provided by the witnesses. The police also collected a dark

hooded sweatshirt which later tested negative for GSR. Moreover, the Nike jacket is not the only dark, hooded jacket collected that contained gunshot evidence—GSR and a partially burned gunpowder particle were found on a sweatshirt collected from Roberts's house. Again, the evidence, such as it was, required the jurors to guess as to whether the GSR found on the Nike jacket came from the gun used to kill the victim.

The alternative theory proposed by the State was that defendant carried the gun to the field where he and Roberts laid in wait to rob the victim. To support the felony-murder theory, the State argued that the two men had just learned that the victim had $50, they were wearing dark clothes, and that the GSR on the jacket showed defendant hid the gun in his sleeve before passing it to Roberts who then shot the victim. As described above, jurors could only speculate as to whether the GSR on the Nike jacket connected defendant to the gun used in this crime. Furthermore, there was no evidence of any plan between defendant and Roberts to rob the victim. Defendant and Roberts walked down the gravel path through the field *before* the victim left Mouton's yard ten minutes later. The State presented nothing suggesting either man could have predicted that the victim would have followed them. Defendant told the State Police detective that he did not know where the victim lived.

Furthermore, Mouton told police that only Roberts went inside his home and came out dressed in long sleeves. If this is when the gun was acquired, then Roberts must have passed the gun to defendant first and then defendant must have passed it back to Roberts in the field. Yet neither Mouton nor Charles saw a gun in defendant's possession or passed between the two men. Finally, the motive of the crime was ostensibly to rob the victim, however, his wallet and over $200 in cash was on his person when he was found the next morning.

Considering all of the evidence in the light most favorable to the prosecution, no rational juror could find the State proved beyond a reasonable doubt that defendant either shot the victim or participated in a plan to rob the victim. The State's circumstantial case against defendant failed to exclude every hypothesis of innocence. "A trial jury's inference that an accused aided and abetted in a crime cannot be 'mere speculation based upon guilt by association.' " *[State v.] Schwander*, 345 So.2d [1173] at 1175 [(La.1977)]. Based on this record, however, speculation based upon guilt by association is all the jury's inference can be. In light of the absence of evidence that defendant knew in advance of any plan to rob the victim, the only explanation for the jury finding defendant guilty in this case was based upon his association with Roberts. Accordingly, we affirm the decision of the appellate court, which reversed defendant's conviction.

*Id.* at 359–60 (footnote omitted).

The State asserts that as the passenger of the Mercedes, Stefan was directly involved in the victim's murder as the shooter. Other than Stefan being in the passenger seat at Walmart and then later at Texaco, however, there is no evidence showing that Stefan was the passenger during a drive-by shooting. Furthermore, there was no evidence of any plan between Stefan and Donald to commit a drive-by shooting nor was there any evidence that Stefan had a gun or had fired a gun. Other than Detective Hargrave's testimony that Gavin Garnica was rumored to live in Unit 322, there was no evidence that Stefan knew Gavin would be at Stone Bridge Apartments or knew that Gavin would be walking outside when they drove through. Other than Gavin Garnica's statement that "them boys" started shooting, there was also no eye-witness testimony as to the shooting itself.

We find that the evidence was insufficient to convict Stefan Briggs of second degree murder. Even if the jury reasonably inferred from the video evidence that the brothers were in the vicinity of the shooting at the time of the shooting and left shortly afterwards, the jury was required to speculate as to whether the shots were fired from the brothers' car. Given the lack of physical evidence connecting the brothers to the shooting, the absence of any weapon, the absence of any evidence connecting the brothers to the victim, and the ambiguous evidence connecting the brothers to Gavin Garnica, the jury's determination that the shots were fired from the brothers' vehicle was based on speculation rather than reasonable inferences. The State failed to exclude every reasonable hypothesis of innocence. For these reasons, we reverse the conviction of Stefan Briggs for second degree murder and vacate the corresponding sentence.

**MOTION FOR NEW TRIAL/ OTHER CRIMES EVIDENCE**

In his second and third assignments of error, Stefan asserts that the trial court should have granted his motion for new trial based on upon newly discovered

27

evidence and the trial court erred in allowing the State to present other crimes evidence.  Because we have determined that Stefan's conviction should be reversed, these assignments of error are moot.

IV.

<u>**CONCLUSION**</u>

We find that assignment of error number one has merit and that the evidence presented by the State was insufficient to support the conviction of Stefan Jermaine Briggs for second degree murder, a violation of La.R.S. 14:30.1.  Therefore, the conviction is reversed, and the corresponding sentence of life imprisonment at hard labor without benefits is vacated and set aside.

**CONVICTIONS REVERSED AND SENTENCE VACATED.**